[Crim. No. 4591. Fifth Dist. Mar. 2, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK MIKE CLAXTON, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Mark L. Christiansen, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Gregory W. Baugher, Wanda Hill Rouzan and Blair W. Hoffman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

STONE (C. V.) J.*—Frank Mike Claxton appeals from a judgment entered on jury verdicts finding him guilty of murder and attempted

*Assigned by the Chairperson of the Judicial Council.

robbery with personal use of a deadly or dangerous weapon in the commission of each offense and infliction of great bodily injury in the attempted robbery. The jury found the murder to be in the first degree and further found the murder to be wilful, deliberate and premeditated and personally committed by the appellant during the attempted commission of a robbery. Because appellant was 17 years old at the time of the offense, he was sentenced to life in prison without possibility of parole. Several issues in the appeal concern the penalty which must be set aside under *People* v. *Davis* (1981) 29 Cal.3d 814, 832 [176 Cal.Rptr. 521, 633 P.2d 186].

The major evidence against appellant was the testimony of one coconspirator, an extrajudicial statement of another, and statements made by appellant after his arrest as related by his cellmates and a juvenile hall employee. The principal issues on appeal concern the use and admissibility of these statements. Due to the seriousness of the offense, our analysis is rather detailed. We conclude that there was no miscarriage of justice in this case. (Cal. Const., art. VI, § 13.)

## STATEMENT OF FACTS

On February 25, 1978, Kern County Deputy Sheriff William Hackney discovered the body of 64-year-old Crittendon Mos. An autopsy disclosed that the cause of death was hemorrhage resulting from multiple stab wounds; Mos had been dead several days. Detective Del Ray was assigned to the investigation. On November 29, 1978, Ray, through a Bakersfield Police Department detective, contacted Pamela Allen, aged 17, and obtained a taped statement implicating an adult, Richard Byrne, and two minors, Kevin Harrington and appellant Frank Claxton, in the death of Mos. On that same date, Ray arrested the two minors.

Appellant was fully advised of his rights pursuant to *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] from a card that Ray carried for that purpose. Appellant stated he understood his rights and would talk to Detective Ray. He remembered that he had been arrested for having guns in the car around the time of the incident but denied any involvement in Mos' death.

The next day, Ray again interviewed appellant after first asking him if he recalled his constitutional rights. Appellant said he did recall his

rights and that nothing had happened to change his mind about answering questions. He again denied any knowledge of the murder and told Detective Ray that he was wasting his time questioning him.

After a fitness hearing in juvenile court, appellant was certified to superior court for trial as an adult. By an information filed January 22, 1979, appellant and Kevin Harrington were charged with attempted robbery and murder of Crittendon Mos; appellant was further charged with special circumstances under the 1977 death penalty legislation (former Pen. Code, § 190.2, subd. (c)(3)(i)) and with enhancements for use of a knife and infliction of great bodily injury.

Pamela Allen was allowed to plead guilty to second degree murder in juvenile court for her participation in the Mos killing, and testified at appellant's trial in accordance with the plea agreement. The following scenario is distilled from the trial testimony of Allen.

In February 1978, Allen lived in Hilltop, California, a small community on Weedpatch Highway, with her mother Betty Schler, 15-year-old sister Laurie Lipp (Pritchard), her mother's boyfriend Richard Byrne, and two brothers. Allen's boyfriend Kevin Harrington lived there part time. Allen knew appellant as a friend of Harrington's.

Sometime during the evening of February 22, 1978, Allen overheard a discussion at the Hilltop home between appellant, Harrington and Byrne about robbing Crittendon Mos. Later that evening, Allen, Lipp, Harrington, Byrne and appellant left the home, appellant in his Mustang, the others in Harrington's Chrysler. Appellant left his automobile in Edison, California, and they all proceeded in the Chrysler. Again the three males talked of robbing Crittendon Mos. It was decided that Allen would call Mos and complain of car trouble and when he came to pick up Lipp and her, the men would shoot and rob him. Each of the men was armed. In furtherance of this plan, Allen called Mos and asked him to come to Malaga Road. At Malaga Road, the men hid behind a dirt bank with their weapons. When Mos arrived, the girls decided they would not go through with the plan and left with Mos. A short time later, appellant picked up the girls at Mos' home and the three then picked up Harrington and Byrne and drove to an abandoned store. Again they discussed killing and robbing Mos. The plan was for

appellant and Allen to go to Mos' home and gain entry. Appellant was then to stab Mos and if he were not dead, the others would come in to "finish him."

Appellant and Allen went to Mos' home in the Mustang. Byrne and Harrington followed in the Chrysler and waited nearby. Mos invited appellant and Allen into his home and agreed they could spend the night after he was told that Allen had had a fight with Harrington.

After they watched television for a short time, Mos got up to get bedding in the next room. Appellant followed him and stabbed Mos as he turned on a light switch. Appellant then told Allen to get the others and she "took off running." She went to where Harrington and Byrne were waiting and told them what had happened. They started toward the house where they met appellant as he was leaving. They asked if Mos were dead; appellant answered that he did not know but that if he were not they were to finish him. Byrne and Harrington went toward the house and after a few minutes returned and they all went back to Hilltop. There they discussed burning Mos' house to destroy the evidence, and appellant and Byrne left to obtain gasoline for that purpose.

From other witnesses at the trial, it was developed that Byrne and the appellant were arrested on February 23, 1978, at about 2:30 a.m. Deputy Sheriff Donald Allen testified that he stopped a Chrysler for missing license plates on Main Street in Lamont. Richard Byrne was the driver and Frank Claxton the passenger. When he approached the vehicle, Deputy Allen saw a sawed-off 12-gauge shotgun in the back seat and ordered the occupants out. Deputy Watkins, who provided backup assistance for the stop, saw a .22 handgun in the open glove compartment directly in front of where appellant had been sitting. Watkins seized the gun which was loaded and had been filed to remove the serial number. The shotgun was not loaded, but several live shells were recovered from Byrne and from the Chrysler. Appellant and Byrne were arrested on weapons charges and taken into custody.

Appellant testified and admitted stabbing Mos, but claimed he did so because he was scared and thought Mos was going for his gun. Appellant denied any plan to rob and kill the victim and explained that the incident occurred when Allen fled to Mos' house after a quarrel and did not want to return to Harrington.

## Discussion

I. *Whether Admission of Appellant's Statement to Huston was Reversible Error.*

On November 29, 1978, appellant, although 18 years of age, was booked at the juvenile hall because he was 17 when the offense occurred. Dennis Huston was employed as a group supervisor at the juvenile hall. Huston explained at trial that he was responsible for making sure the juveniles were where they were supposed to be. He was not a probation officer and had no investigative functions. He was acquainted with appellant from a prior commitment.

On December 5, 1978, Huston was assigned to the security unit which housed the "more sophisticated or the ones who are charged with the more serious crimes." He was aware that appellant was detained in a single room in the security unit on a homicide charge. Huston was told by the senior supervisor to allow appellant out of his room for the first time to participate in a program with other detainees. Huston was seated in front of the office when appellant sat next to him and asked, "'How is it going, Mr. Huston?'" Huston answered, "'Fine,'" then continued, "'What did you get yourself into?'" Appellant shook his head and replied to the effect that it would have been a perfect crime and he would not have been caught if Harrington's girl friend had not "snitched." Appellant then, in narrative form, related to Huston the events surrounding the death of Crittendon Mos. As the appellant talked, Huston injected some questions for the purpose of clarifying some points that Huston did not understand.

Appellant's narrative as related to Huston was, on the whole, consistent with Allen's trial testimony: he and others had planned to rob and kill Mos, and went to his house for that purpose. However, appellant explained that he did not know beforehand whether he would actually kill Mos. He stated that the stabbing was on "impulse."

There was another supervisor seated three to four feet to Huston's right who was not involved in the conversation and was not a witness at the trial. Huston related his conversation with appellant to his supervisor, who apparently informed a deputy district attorney. Approximately five to seven days after the conversation, Huston was asked by the deputy district attorney to prepare a statement of his recollection of the conversation. He was reluctant to prepare the statement, because he did

not want to appear as a witness in the subsequent trial, but eventually he acceded to the district attorney's request.

The trial judge ruled that appellant's statement to Huston was voluntary. "I think it is voluntary, that therefore *Miranda* rights do not have to be given under the circumstances."

■ Appellant contends that his statement to Huston was obtained in violation of *Miranda* and, because it was "fully incriminatory and a confession to at least a felony-murder," the judgment of conviction must be reversed. Respondent counters that appellant's statement was not in response to interrogation.

We thus frame the issues: (1) was the statement a confession or admission; (2) the status of Huston; and (3) whether there was interrogation.

Preliminarily, we review the principles by which we must be guided in resolving these issues. Our genesis is *Miranda* v. *Arizona, supra,* 384 U.S. 436. Before an accused's extrajudicial statement resulting from custodial interrogation can be received against him, the burden is on the prosecution to prove that the defendant was informed in clear and unequivocal terms of (1) his right to remain silent; (2) that anything he says can and will be used against him in court; (3) his right to the presence of counsel, including the right to have counsel present at the interrogation; and (4) that counsel will be appointed to represent him if he is indigent. (*Id.,* at pp. 467-479 [16 L.Ed.2d at pp. 719-726].)

A. *Admission or Confession.*

■ It is settled that, although introduction of a wrongfully obtained admission may be found nonprejudicial if the error is shown harmless beyond a reasonable doubt, introduction of an involuntary confession is considered to be so damaging as to require automatic reversal of the conviction. (*People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620].)

■ Although appellant told Huston that he was acting under "impulse," he also stated that he and the other conspirators had planned to rob and kill Mos before driving to his house. We agree with appellant that the statement is a confession because it discloses his intentional participation in first degree murder, at least on a felony-murder theory.

If the confession was a result of custodial interrogation by the police or their agents without due regard to *Miranda* procedural safeguards, automatic reversal of the conviction is mandated. (*People v. McClary, supra*, 20 Cal.3d at p. 230; *People v. Disbrow* (1976) 16 Cal.3d 101, 115-116 [127 Cal.Rptr. 360, 545 P.2d 272].)

### B. *Scope of Review.*

In California the prosecution at trial level has the burden of proving beyond a reasonable doubt that a defendant's statement was voluntary and was not the product of any form of compulsion or impermissible police practices. (*People v. Jimenez* (1978) 21 Cal.3d 595, 602, 609 [147 Cal.Rptr. 172, 580 P.2d 672]; *People v. Trout* (1960) 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418].) "[S]ince confessions or admissions obtained without a valid waiver of *Miranda* rights are deemed to have been coerced, the prosecution bears also the burden of proving waiver beyond a reasonable doubt." (*People v. Murtishaw* (1981) 29 Cal.3d 733, 753 [175 Cal.Rptr. 738, 631 P.2d 446].) After the statement has been admitted into evidence, the burden then shifts on appeal to the defendant to establish that he did not competently and intelligently waive his rights. (*People v. Duren* (1973) 9 Cal.3d 218, 237 [107 Cal.Rptr. 157, 507 P.2d 1365].)

Appellant does not contest that he gave his statement to Huston in the manner outlined above. Appellant did not testify at the suppression hearing. At trial, appellant disputed some of the contents of the statement but did not contradict Huston's version of the events leading up to the statement.

The duty of the appellate court is to examine the uncontradicted facts in the record to make an independent determination whether the trial court's finding of voluntariness was properly found. (*People v. Jackson* (1980) 28 Cal.3d 264, 300 [168 Cal.Rptr. 603, 618 P.2d 149]; *People v. Jimenez, supra*, 21 Cal.3d 595, 609.)

### C. *Status of Huston.*

Huston described his duties as group supervisor[1] as follows: "Group Supervisors are in charge of the daily handling of the juveniles being

---

[1]Welfare and Institutions Code section 852 provides: "The juvenile hall shall be under the management and control of the probation officer."

Welfare and Institutions Code section 853 provides: "The board of supervisors shall

detained in Juvenile Hall and they need to be run through a program each day such as a school program and they might have to be taken to court and so forth and on work details."

 Huston had no investigative functions; he was neither a probation officer, nor a peace officer, at the time of these events.[2] He had a position of trust with the juvenile inmates due to his daily contact with them; however, his status logically should be no different than that of any other civilian employee in daily contact with the inmates who has custodial or service, as distinguished from investigative, functions.

Again, we must look to *Miranda* to define the problem. The abuse addressed by the *Miranda* court was the practice of law enforcement agents overcoming the will of the accused in violation of Fifth Amendment rights. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody . . . ." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at p. 706].) In discussing the four cases then before the court, Chief Justice Warren wrote, "In each, the defendant was questioned by police officers, detectives, or a prosecuting attorney in a room in which he was cut off from the outside world." (*Id.,* at p. 445 [16 L.Ed.2d at p. 707].) "The concern of the Court in *Miranda* was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." (*Rhode Island* v. *Innis* (1980) 446 U.S. 291 [64 L.Ed.2d 297, 100 S.Ct. 1682].)

However, "[a] private citizen is not required to advise another individual of his rights before questioning him. [Citations.] Absent evidence of complicity on the part of law enforcement officials, the admissions or statements of a defendant to a private citizen infringe no constitutional guarantees." (*People* v. *Mangiefico* (1972) 25 Cal.App.3d 1041, 1049

---

provide for a suitable superintendent to have charge of the juvenile hall, and for such other employees as may be needed for its efficient management, and shall provide for payment, out of the general fund of the county, of suitable salaries for such superintendent and other employees."

[2]Penal Code section 830.5 was amended in 1980 to provide peace officer status to ". . . any superintendent, supervisor, or employee having custody of wards in an institution operated by a probation department, . . ." (Stats. 1980, ch. 1340, § 13, urgency eff. Sept. 30, 1980.) The section was again amended by Statutes 1981, chapter 1142, section 5 to include as peace officers "any superintendent, supervisor, or employee having custodial responsibilities in an institution operated by a probation department, . . ."

[102 Cal.Rptr. 449]; *In re Deborah C.* (1981) 30 Cal.3d 125, 130-131 [177 Cal.Rptr. 852, 635 P.2d 446].)

Appellant argues that because Huston was employed by the state and had a special relationship with the appellant, *Miranda* should apply. If Huston had been attempting to obtain a statement from appellant to be used by the People against appellant, then he would in fact be an agent of law enforcement practicing the evil addressed by *Miranda.* The uncontradicted fact is that Huston was not acting as an agent of law enforcement. Appellant cites several cases in which law enforcement status has been applied to other than sworn police officers. In each of these cases, the individual was acting on behalf of or as an agent of law enforcement.

In *People v. Mosher* (1969) 1 Cal.3d 379 [82 Cal.Rptr. 379, 461 P.2d 659], a psychiatrist examined the defendant at the request of the district attorney without obtaining a valid waiver of the right to counsel. The court noted that in *In re Spencer* (1965) 63 Cal.2d 400 [46 Cal.Rptr. 753, 406 P.2d 33], it had required that ". . . warnings be given defendant and that he knowingly and intelligently waive his right to the presence of counsel during the interview; otherwise, the psychiatrist might disguise himself in the cloak of professionalism and yet interrogate the defendant on behalf of the prosecution." (*People v. Mosher, supra,* 1 Cal.3d at p. 397.)

Appellant compares Huston to a probation officer and states that the same reasoning should apply. He cites *People v. Harrington* (1970) 2 Cal.3d 991 [88 Cal.Rptr. 161, 471 P.2d 961] for the proposition that admissions made to a probation officer prior to sentencing ". . . in the hope that candor will persuade the probation officer to make a favorable report to the court" are not admissible. (*Id.,* at pp. 999-1000.) The fallacy in that analogy is that the statements of the defendant to the probation officer would not be admitted even if the *Miranda* warnings were given.

In *Bryan v. Superior Court* (1972) 7 Cal.3d 575 [102 Cal.Rptr. 831, 498 P.2d 1079], the court examined the use against a minor of his admissions made in connection with juvenile court proceedings and concluded that such statements should not be used against a minor in criminal proceedings for policy reasons similar to those discussed in *Harrington,* and to provide the minor the protection of exclusionary rules which apply to all persons charged with the commission of crimes.

*In re Wayne H.* (1979) 24 Cal.3d 595 [156 Cal.Rptr. 344, 596 P.2d 1] is also of no help to appellant. In that case, the Supreme Court excluded an incriminating statement made by the minor to a probation officer during an interview required under Welfare and Institutions Code section 628. The court held that such statements are inadmissible as substantive evidence or for impeachment in any subsequent proceeding to determine guilt because it is necessary for the purpose of the Juvenile Court Law to encourage candor on the part of the minor. However, such statements can be "admitted and considered in hearings on the issues of detention and fitness for juvenile treatment." (*Id.*, at pp. 601-602.)

In *People v. Webster* (1971) 14 Cal.App.3d 739, 742-743 [93 Cal.Rptr. 260], the court considered a statement made, postconviction, to a corrections counselor employed by the State Department of Corrections. The People sought to use the statement on retrial. Within that factual context the court held a *Miranda* admonishment was required: "The purpose of post-conviction interviews is not to obtain further evidence of guilt and insure conviction but to rehabilitate. Neither the individual defendant nor the state gains by a subversion of rehabilitation procedures to the evidentiary requirements of the prosecution." (*Id.*, at p. 743.)

The strong policy considerations present in *Harrington, Bryan, In re Wayne H.*, and *Webster* are not controlling here. In each of those cases the defendant was encouraged to discuss his offense with candor for some governmental purpose not present in the instant case.

From the cases reviewed, we can extract a general rule that in all instances in which a statement is given by a defendant in a custodial setting, in response to interrogation by law enforcement agents who are acting in an investigative function, *Miranda* requirements must be satisfied or the statement cannot be used at trial. There do not appear to be any reported California cases requiring *Miranda* admonitions from non-peace officers except where they attempt to elicit information for some governmental purpose.

In conclusion, to confer law enforcement status on Huston to exclude appellant's confession would be an unwarranted extension of the rules elucidated in *Miranda*. The issues could be disposed of with this conclusion. However, in view of appellant's reliance on *Rhode Island v. Innis,*

*supra*, 446 U.S. 291, we feel constrained to discuss the impact of that case on the facts.

### D. *Interrogation or Neutral Inquiry.*

"The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." (*Miranda* v. *Arizona, supra*, 384 U.S. at p. 478 [16 L.Ed.2d at p. 726].) California cases have reiterated this principle: ". . . even a defendant in *custody* might make statements admissible under *Miranda* if it were shown that such statements were the result of the defendant's own initiative and did not arise in a context of custodial *interrogation.*" (*People* v. *Ireland* (1969) 70 Cal.2d 522, 536 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323], citing *People* v. *Fioritto* (1968) 68 Cal.2d 714, 719-720 [68 Cal.Rptr. 817, 441 P.2d 625].)

In *People* v. *Ashford* (1968) 265 Cal.App.2d 673 [71 Cal.Rptr. 619], a courtroom bailiff testified that he had a conversation with the defendant as they were leaving the courtroom during a noon recess. He wrote down the conversation and handed it to the district attorney. The defendant's incriminating statement was made in response to the bailiff's salutation, "'How's it going, Ashford?'" (*Id.*, at p. 685.) In ruling on the admissibility of the statement, the court held: "This setting falls far short of the situation contemplated and interdicted by *Miranda* and other cases which require a similar foundation as a condition precedent to the use of statements elicited as the result of official interrogation." (*Ibid.*)

*Miranda* and its progeny do not attempt to proscribe the use of all incriminatory statements made by an accused. If we assume arguendo that Huston was acting as an agent of law enforcement, was his statement custodial interrogation or a neutral inquiry?

In *Rhode Island* v. *Innis, supra*, 446 U.S. 291, the defendant, suspected of robbery and murder, was in the custody of the police who were under orders not to question or threaten him. On the way to the police station the officers engaged in conversation between themselves regarding the location of the gun used in the crimes. They expressed the fear that the loaded gun might be found by children in the area. The

suspect interrupted and offered to show the officers the gun. He then led them to the weapon and made incriminating statements after further warnings concerning his rights. The court held the conversation not to be custodial interrogation. However, in defining interrogation, the court went on to say: "We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (*Rhode Island* v. *Innis, supra*, 446 U.S. at pp. 300-302 [64 L.Ed.2d at pp. 307-308]; fns. omitted.)

Appellant argues that Huston "should have known," under the circumstances, that his question was "reasonably likely to elicit an incriminating response."

We have already drawn the more obvious distinction, i.e., that the holding is directed at "words or actions" on the part of police and not private citizens. We do not perceive the neutral inquiry, "What did you get yourself into?" as words that Huston *should have known* were reasonably likely to elicit an incriminating response."

In the patois of the streets or jailhouse, the inquiry is tantamount to "What's up?" or "What are you in for?" The question did not require an inculpatory reply, nor does anything in the record suggest that Huston expected one. Appellant, if he had desired not to talk, could have countered Huston's "offhand" remark with any one of a number of rejoinders, from a laconic "trouble" to a recitation of the charges against him, or the alternative, a disclaimer such as he twice gave to Ray. He

chose instead, for his own reasons, to make a full confession. That his will was not overcome by Huston is further evidenced by appellant's claim of "impulse" and his failure to name his adult crime partner, who at that time had not been apprehended.

Although the court in *Rhode Island* stated that the definition of interrogation focuses on the perceptions of the suspect, this was to remove the necessity of proving the underlying intent of the police in ambiguous circumstances. However, the court did allow for inquiry into the intent of the police. "This is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response." (*Rhode Island* v. *Innis, supra,* 446 U.S. at pp. 301-302, fn. 7 [64 L.Ed.2d at p. 308].) Certainly the intent of Huston is highly probative; he did not intend to elicit incriminatory statements from the appellant to be used against him.

In discussing the significance of the intent of the interrogators, the California Supreme Court in *People* v. *Stewart* (1965) 62 Cal.2d 571, 579 [43 Cal.Rptr. 201, 400 P.2d 97] (affd. *sub nom. Miranda* v. *Arizona, supra,* 384 U.S. 436), stated: "Whatever may be the subjective intent of the interrogators, we must, in order to determine if the police are carrying out 'a process of interrogations that lends itself to eliciting incriminating statements' [citation], analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances."

If we ignore the subjective intent of Huston and look only to the objective factors, the record shows that: (1) appellant sought Huston out and initiated the conversation; (2) Huston did not report the conversation to police; and (3) Huston testified as a reluctant witness. These circumstances persuade us that Huston did not carry out "a process of interrogations that lends itself to eliciting incriminating statements." (*Escobedo* v. *Illinois* (1964) 378 U.S. 478, 491 [12 L.Ed.2d 977, 986, 84 S.Ct. 1758, 1765].)

II. *Hitch Motion.*

Huston prepared a three-page handwritten account of appellant's statement to him at the request of Deputy District Attorney Baird five

days to one week after the conversation. These notes were subsequently typed by someone in the juvenile hall office. The one-page typewritten version was given to Baird, who in turn had Huston check it for accuracy. The original handwritten notes were not returned to either Baird or Huston. Baird was unable to testify whether the typed version was an exact copy of the notes or a synopsis, but stated "I can't remember exactly word-for-word, but [it] covers the same narration of events that I remember." Huston testified "[t]his one-page report contains all the important facts that I related in my three-page handwritten report. By re-reading the report I see nothing here, I can remember nothing, that I left out." He could not say with absolute certainty that the typed report was an exact copy.

■■■ Appellant now contends that the failure to preserve the handwritten notes prejudiced appellant's ability to impeach Huston's testimony and, because there was a "reasonable possibility" that the report could have produced evidence favorable to the appellant, his testimony should have been excluded under *People* v. *Hitch* (1974) 12 Cal.3d 641, 649 [117 Cal.Rptr. 9, 527 P.2d 361].

Respondent argues that appellant is precluded from raising this claim on appeal because no motion to exclude was made in the trial court. This contention is correct.

At the pretrial suppression hearing, the defense motion for discovery of Huston's handwritten notes was granted. Baird testified as set forth above and stated he was unable to locate the handwritten report. The record shows no motion ever was made to exclude Huston's testimony based on the prosecution's failure to preserve Huston's notes. Failure to raise the point properly in the trial court precludes consideration of appellant's claim on appeal. As stated in *People* v. *Carrasco* (1981) 118 Cal.App.3d 936, 940 [173 Cal.Rptr. 688]: ". . . fairness to the prosecution and the trial court requires that *Hitch* be raised below. The prosecution should have a chance to argue that the subject evidence was not material and/or to show that the government had established, enforced and attempted in good faith to adhere to rigorous and systematic procedures to preserve the evidence. (*People* v. *Hitch, supra*, 12 Cal.3d at pp. 652-655.) The trial court should have a chance to rule on the specific theory on which it later may suffer appellate reversal." (See also *People* v. *Smith* (1977) 70 Cal.App.3d 306, 318 [138 Cal.Rptr. 783].)

Even though we have found a waiver in the instant case, we note here as we did in *People* v. *Garnica* (1981) 121 Cal.App.3d 727, 733 [175 Cal.Rptr. 521], "... even if there may be *some* possible materiality in the missing evidence, the trial court need not impose sanctions unless the defendant makes a showing of '*substantial* materiality.'" Appellant's chimerical contention that there was a "reasonable possibility" that the original notes would be favorable is unsupported by the known facts.

III. *Discovery.*

Before the completion of Allen's testimony, appellant moved that the district attorney be held in contempt for violation of a previous discovery order. He asserted that the prosecutor failed to provide the address of Allen or the results of her plea bargain. He later amended the motion to request a mistrial or, in the alternative, an order for further discovery. The court denied the motion for mistrial and later granted the motion for discovery of Allen's juvenile file, ordering a continuance to permit counsel to examine the file. Appellant now argues it was an abuse of discretion to deny the motion for mistrial because the appellant was prejudiced when the information concerning Allen was not discovered until trial.

We need not determine whether there was a violation of the discovery order. It is established that the proper remedy for failure to disclose is to permit the complaining party an opportunity to meet any new evidence. (*People* v. *Reyes* (1974) 12 Cal.3d 486, 501-502 [116 Cal.Rptr. 217, 526 P.2d 225]; *People* v. *McGowan* (1980) 105 Cal. App.3d 997, 1002 [166 Cal.Rptr. 725].)

Appellant had received two taped statements and an FBI report regarding Allen before the trial commenced. Defense counsel interviewed her the evening before his motion for mistrial. Appellant neither requested additional time to interview Allen, nor did he request a continuance to attempt to contest any new evidence his oral interview might have disclosed.

Appellant has failed to show that any prejudice resulted from the claimed lack of discovery; nor has he pointed out any of Allen's testimony that differed from her previous taped statements. A reasonable inference is that Allen's trial testimony was fully consistent with her statements made before she entered into any plea negotiations. "The

burden is on the accused to establish prejudice where there has been a lack of timely discovery, and in the absence of prejudice the judgment must be affirmed." (*People* v. *Foster* (1981) 114 Cal.App.3d 421, 432 [170 Cal.Rptr. 597]; *People* v. *Sewell* (1978) 20 Cal.3d 639, 646 [143 Cal.Rptr. 879, 574 P.2d 1231].) Appellant has failed to meet the burden.

## IV. *Cross-examination.*

### A. *Pamela Allen.*

When Pamela Allen was interviewed by the police on February 27, 1978, she told them that she had last seen Crittendon Mos on the Wednesday preceding his death. She also told them that she and her sister had called Mos to help them when they got stuck in the mud. She said she could not remember whether she then told the police anything about appellant killing Mos. Defense counsel attempted further cross-examination concerning a statement she made to the police about a narcotic deal that involved Mos. The district attorney objected and asked for an offer of proof. Outside the presence of the jury it was disclosed that Allen had told investigating officers that Mos, during the ride from Malaga Road to his house, had told her about four girls coming to his house the previous night, and his involvement with them in a sale of marijuana. Defense counsel argued that he should be allowed to cross-examine in this area because it showed she had told a "whole pack of lies to the police." Both at trial level and on appeal appellant assumes that the conversation with Mos did not occur and further assumes that Allen would admit the untruth if she were asked.

The court correctly ruled that Allen's testimony was not inconsistent with her statement to police and that testimony as to what Mos had told Allen was collateral and not relevant. Appellant now claims the evidence was relevant on the question of Allen's motivation to fabricate a story.

The trial court's decision to exclude evidence may not be disturbed on appeal absent clear error of law or manifest abuse of discretion. Evidence may be excluded under Evidence Code section 352 if it is prejudicial to either the prosecution or the defense. (*People* v. *Love* (1977) 75 Cal.App.3d 928, 940-941 [142 Cal.Rptr. 532]; Witkin, Cal. Evidence (2d ed. 1966) § 308, pp. 272-273.)

Appellant has failed to establish either an error in law or an abuse of discretion. The trial court could reasonably determine that evidence of Allen's statement to the police concerning her conversation with Mos would be hearsay if offered to show another theory for Mos' death, and irrelevant on any other theory.

### B. *Stafford and Pixler.*

While incarcerated at the Kern County jail, appellant met Cal Stafford and Johnny Pixler, fellow inmates. In a number of conversations before his preliminary examination, appellant described to them his involvement in the Mos killing.

At trial Stafford testified that appellant had bragged about killing Mos. His testimony was consistent with that of Allen and Huston, with a few exceptions. Appellant mentioned nothing of "impulse" to Stafford. He told Stafford that he stabbed Mos in the back and then four or five more times in the front. He said he took the knife with him to the car and gave it to Harrington; that he wanted to go back inside for the money, but no one would go with him.

Johnny Pixler also testified that he met appellant in the Kern County jail and that appellant bragged about killing a man and described the details of the crime. Pixler's description of the homicide, as related to him by appellant, was not as detailed as the testimony of Allen, Huston and Stafford, but was, in the main, consistent.

Appellant's contentions that the trial court improperly limited impeachment of Stafford and Pixler concern two different areas. Appellant first claims that the court incorrectly prevented appellant from showing the true nature of conversations with his cellmates. He also urges that he was erroneously precluded from presenting evidence of the nature of the charges pending against Stafford and Pixler.

### 1. *Content of Conversations With Appellant.*

Appellant denied that he confessed to either Stafford or Pixler. He admitted discussing the case with them, but only in the sense of discussing the charges and the evidence presented at the preliminary hearing and recounted in the newspapers.[3] Appellant testified that Stafford had

---

[3]It appears from the record that these conversations actually occurred prior to the preliminary examination.

taken a class in "street law." The district attorney objected to the testimony as hearsay. Defense counsel argued that appellant was entitled under Evidence Code section 356 to testify to his version of the conversation.[4] The court sustained the objection and ruled, citing *People* v. *Williams* (1975) 13 Cal.3d 559, 564-566 [119 Cal.Rptr. 210, 531 P.2d 778], and *People* v. *Perry* (1972) 7 Cal.3d 756, 786-787 [103 Cal.Rptr. 161, 499 P.2d 129], that, absent a further showing of relevancy, portions of the conversations not related to the crime would be excluded. Appellant contends that this ruling was erroneous; that it prevented appellant from demonstrating that there was a possibility that Stafford was mistaken "or heard only what he wanted to hear within that context." Appellant also complains that the ruling precluded examination into "anything of a sexual nature other than a matter which would indicate the statement of the appellant . . . was coerced." Appellant did not make an offer of proof as to the nature of this proposed testimony although invited to do so by the court.

We, of course, support the general principles of law relied on by appellant in challenging the ruling of the trial court. The right to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been established as essential to due process. (*In re Oliver* (1948) 333 U.S. 257, 273 [92 L.Ed. 682, 694, 68 S.Ct. 499, 507]; *Chambers* v. *Mississippi* (1973) 410 U.S. 284, 294 [35 L.Ed.2d 297, 308, 93 S.Ct. 1038, 1045].)

"The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" (*Davis* v. *Alaska* (1974) 415 U.S. 308, 316 [39 L.Ed.2d 347, 354, 94 S.Ct. 1105, 1110].) However, application of these general principles must be curbed by more specific rules of evidence.

 Evidence Code section 356 provides in relevant part: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . ." It is this section of the Evidence Code that so often gives rise to counsel's statement, "He opened the door." There is no "open door" policy in California.

---

[4]The testimony appears to be innocuous. However, the district attorney expressed his fear, outside the presence of the jury, that defense counsel was attempting through this ploy to inform the jury that appellant faced a possible sentence of life without possibility of parole.

In *People* v. *Williams, supra*, 13 Cal.3d 559, 565, the court noted that section 356 is subject to the qualification that portions of a conversation not relevant to the portion introduced may be excluded. We find no error in the court's limiting evidence of other matters involved in the conversation where the defendant denied making the statement at issue. In the language of *Williams*, appellant "cannot persuasively argue that the context of the statement would have vitiated its apparent significance." (*Id.*, at p. 566.)

### 2. *Evidence of Specific Charges Against Cellmates.*

Stafford had been previously convicted of robbery and, when he met appellant, was pending sentencing on a charge of being an ex-felon in possession of a weapon. Apparently, he was on probation at the time of his arrest. Pixler had been charged with violations of Penal Code sections 286 and 288.

Appellant argues that it was error for the judge to refuse to permit the defense to introduce evidence of those specific charges against Stafford and Pixler to show bias and motive to fabricate. Respondent answers that the judge acted within his discretion in excluding the evidence under Evidence Code section 352.

"[E]xposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." (*Davis* v. *Alaska, supra*, 415 U.S. 308, 316-317 [39 L.Ed.2d 347, 354].) It is permitted to inquire whether charges are pending against a witness as a circumstance tending to show that the witness may be seeking leniency through testifying. (Witkin, Cal. Evidence, *supra*, § 1231, p. 1138; Evid. Code, § 780, subd. (f).)

The defense was permitted to show that Stafford and Pixler were in jail and awaiting sentence at the time they informed authorities of appellant's statements. The court ruled inadmissible the evidence of the charges against Pixler, Stafford's probationary status and the charges for which he was arrested under *People* v. *Woodard* (1979) 23 Cal.3d 329 [152 Cal.Rptr. 536, 590 P.2d 391] and *People* v. *Carr* (1973) 32 Cal.App.3d 700 [108 Cal.Rptr. 216]. Both of these cases concern admissibility of evidence of conviction of a felony to impeach a witness under Evidence Code sections 788 and 352. They are not in point where

the *nature* of the charges against the witness is offered to show motive for falsification or bias.

Nevertheless, we do not find that the court's ruling was prejudicial error under the circumstances. The witnesses' incarceration and hopes to benefit from giving testimony were amply demonstrated to the jury, and defense counsel argued in summation that the jury should consider whether Stafford and Pixler had something to gain from their testimony.

## V. *Promises of Leniency.*

Appellant next contends that his conviction was based upon coerced testimony in that the testimony of Stafford was procured under an implied promise of leniency and that "this case should be reversed not only [to prevent] this type of action from denying a fair trial, but also for the actual prejudice caused to appellant."

Appellant's claim of coercion is not supported by the record. Stafford was jailed on a misdemeanor sentence for a conviction on a guilty plea to being an ex-felon in possession of a weapon. Stafford had been convicted of robbery in 1976 and sent to CYA. The jail term for Stafford's current offense was due to expire on August 5, 1979. Stafford testified that no promises had been made to him that he would be released from jail prior to August 5. However, when Stafford contacted Detective Ray shortly after his conversation with appellant and gave a taped statement of appellant's admissions, Stafford inquired whether he would get a reduction of his term. Ray said that he could not do anything at that time. At the outset of appellant's trial, Stafford had an application pending for sheriff's parole. He was released on parole after testifying.

While appellant is correct that a conviction founded upon testimony coerced by the state would violate basic due process (see *People v. Medina* (1974) 41 Cal.App.3d 438, 455-456 [116 Cal.Rptr. 133]), no showing of such coercion was made in this case. In *Medina*, the court found a violation of due process where the immunity of accomplice witnesses was expressly conditioned upon their agreement to testify in a particular fashion. (*Ibid.*)

It is also an obvious denial of due process to offer immunity to a witness on the condition that the witness' testimony produce a conviction. (*People v. Green* (1951) 102 Cal.App.2d 831, 834-835, 839 [228 P.2d

867].) However, in the recent case of *People* v. *Meza* (1981) 116 Cal. App.3d 988 [172 Cal.Rptr. 531], a murder prosecution, the court found no impropriety in permitting the testimony of a witness (not an accomplice) who had been offered a 50-50 chance of receiving a lenient sentence on his armed robbery charges in return for testifying against the defendant. The court stated: ". . . if we assume [the witness] would receive the benefit of his bargain only if his testimony was beneficial or valuable to the prosecution, that alone is not such an inducement as to place him under the kind of compulsion condemned in the cases cited, since the very nature of the agreement described contemplates that something of assistance to the prosecution will be forthcoming from the informant, else what would be its purpose so far as the former is concerned.

"What is improper, in our view, is not that what is expected from the informant's testimony is that it will be favorable to the People's case, but that the testimony must be confined to a predetermined formulation or rendered acceptable only if it produces a given result, that is to say, a conviction. If it were otherwise, no evidence of the sort obtained here could ever be produced, a result neither required by reason nor compelled by precedent." (*Id.*, at p. 994.)

In this case, there is no evidence that Stafford was expressly or impliedly led by state officials to believe that his chances for parole depended upon the content or effect of his testimony. As discussed above, the question of Stafford's *motivation* in informing and testifying was adequately aired before the jury and was obviously an important factor in evaluating his credibility. (See *People* v. *Lyons* (1958) 50 Cal.2d 245, 265 [324 P.2d 556].) Appellant's claim of coercion is not supported by the record.

VI. *Testimony of Conspirators.*

■■■ Appellant contends that a number of statements of alleged co-conspirators were erroneously admitted on the theory that they proved a mental state of the declarant under Evidence Code sections 1250 and 1251 (exceptions to the hearsay rule for statements of the declarant's then existing or previously existing mental or physical state). Appellant argues that, to the extent that this evidence showed the mental state of others, it was irrelevant to the matters in issue, e.g., appellant's intent and knowledge.

As respondent points out, it is of no consequence that the theory of admissibility of this evidence was incorrect because the statements in the course of and in furtherance of the conspiracy were properly admitted under Evidence Code section 1223. (*People* v. *Leach* (1975) 15 Cal.3d 419, 430-431, fn. 10 [124 Cal.Rptr. 752, 541 P.2d 296].) The jury was fully instructed on the law of conspiracy, including CALJIC No. 6.24, containing the rules to be applied in considering the statements of an alleged coconspirator.

Allen's testimony that Byrne requested that she call "Cowboy" to borrow money during the day of the murder was not offered for a hearsay purpose, but to show motive for the conspiracy. Appellant does not explain why admission of this evidence was error, or how he has been prejudiced by any error in its admission. We note that Allen later testified without objection that the conspirators discussed and abandoned an alternative plan to rob Cowboy, and that an objective of the plan to kill Mos was robbery.

Byrne's statement to Allen, that when he went into the house and saw Mos choking on his own blood he smiled and walked away, was inadmissible hearsay. (See *People* v. *Leach, supra*, 15 Cal.3d 419.) This statement could not have prejudiced appellant in light of his own admissions to Allen that he had to prop up the victim to finish stabbing him and that the old man pleaded for his life.

VII. *Statement of Harrington.*

 Harrington and Byrne were each called by the defense outside the presence of the jury and asserted their Fifth Amendment rights not to testify. Harrington also indicated that he would refuse to testify if called by the People. Thereafter, over defense objections on hearsay, denial of confrontation and relevancy grounds, the prosecution was permitted on rebuttal to read into the record part of Harrington's extrajudicial statement to police on the theory that the statement was admissible to show Harrington's past state of mind as to intent, plan or motive. Despite lengthy discussion of the need to edit the statement, the following portion was read to the jury by Detective Ray:

"'He sold, you know, Rick was supposed to have gave [*sic*] Critt some copper and Critt was supposed to paid [*sic*] him $600.00 the week following and Critt didn't show up with the money so it rode on for about two months and one day Rick asked us if we wanted to make

some quick money so we told him, "Yeah," you know. And so he said we would have to snuff Critt.

"'Question: Hold it right there just a second, Kevin. Now, when you say "Rick", who is this?

"'Answer: Richard Byrnes, B-y-r-n-e-s, Richard Byrne, B-y-r-n-e.

"'Question: Okay. Now Rick asked you if you would like to make some money and when you answered that you would he said you would have to snuff Critt?

"'Answer: Right. He said that Critt usually carries about eight hundred to one thousand dollars on him and that besides him we would get Cowboy. I don't know his real name but we would snuff him too and that would carry us about one thousand dollars apiece and then we were supposed to head for L.A. and hide out for awhile at his sister's. Then he set up, you know, he set up a place where he wanted him to get shot. So we was [sic] supposed to get him out there on Malaga and Mountain View. That's where the girls, Pam and Laurie, were supposed— they called him—Rick had them call him so he would come out there.'"

Appellant now contends that this statement was inadmissible double hearsay and, even if admissible under an exception to the hearsay rule, its introduction violated his constitutionally protected right to confront witnesses against him. Respondent takes the position that the statement was admissible as a declaration against penal interest (Evid. Code, § 1230) and that any confrontation violation was harmless beyond a reasonable doubt.

Evidence of the underlying conversation was not offered for the truth of the matters stated (Evid. Code, § 1200), but to show that the statements were made. (See *People* v. *Curtis* (1951) 106 Cal.App.2d 321, 326 [235 P.2d 51].) Because appellant's testimony constituted a denial that there was any plan to kill Mos, the conversation disclosed by Harrington was relevant for the nonhearsay purpose of showing the existence, nature and objects of the conspiracy.

Harrington's remarks to the police qualify as a declaration against penal interest. To be admitted under Evidence Code section 1230, a statement must be specifically disserving to the interest of the unavailable declarant. (*People* v. *Leach, supra*, 15 Cal.3d 419, 441.) The

portion of Harrington's statement to police read to the jury was against his penal interest.

However, under *People v. Shipe* (1975) 49 Cal.App.3d 343 [122 Cal.Rptr. 701] and *People v. Coble* (1976) 65 Cal.App.3d 187 [135 Cal.Rptr. 199], appellant's right of confrontation was violated by introduction of this statement. Under *Shipe* and *Coble*, even where declarations of a coparticipant satisfy the requirements for admissibility under Evidence Code section 1230, the court must inquire whether, under the circumstances of the particular case, use of a statement effectively denies a defendant his right to confront and cross-examine an adverse witness. "If the extra-judicial statement is of minor importance or on a collateral issue and it satisfies the requirements of hearsay exceptions established by the rules of evidence, it is admissible, but if the extra-judicial statement goes to the heart of the case, if it is 'crucial' or 'devastating' to the defendant, then it cannot be admitted unless the defendant's constitutional right of confrontation is satisfied." (*People v. Coble, supra*, 65 Cal.App.3d 187, 195; cf. *People v. Pic'l* (1981) 114 Cal.App.3d 824, 875-877 [171 Cal.Rptr. 106].)

The Harrington statement went to the critical issues in the case: the existence of a motive and plan to rob and kill Mos. Unlike the statement admitted in *People v. Garcia* (1981) 115 Cal.App.3d 85, 105-106 [171 Cal.Rptr. 169], the Harrington statement was not edited to remove the references to "us" and "we," which clearly implicated appellant. Under the circumstances, cross-examination would have served a useful purpose. (*People v. Coble, supra*, 65 Cal.App.3d at p. 196.)

A denial of confrontation requires reversal unless the error is found to be harmless beyond a reasonable doubt. (*People v. Leach, supra*, 15 Cal.3d 419, 446.) Here, the extrajudicial statement was merely cumulative of other properly admitted evidence of motive and plan to rob and kill the victim, including appellant's admissions; as in *Coble*, the error does not warrant reversal. (See *People v. Coble, supra*, 65 Cal.App.3d at pp. 197-198.)

VIII. *Penal Code Section 1368.*

 After the People had rested, appellant's counsel, citing his extensive experience as a defense attorney in serious criminal trials, indicated that he had developed serious doubts concerning appellant's

mental ability to assist in his defense and requested a competency hearing under Penal Code section 1368. Counsel indicated that his concern was based on appellant's inappropriate emotional response to a serious trial, the statements of his stepparents that appellant's behavior during the trial was strange, an earlier diagnosis by a court-appointed psychiatrist that appellant had a personality disorder, and the fact that appellant had suffered head injuries at an unspecified time in the past. Counsel declined to put on any witnesses, stating that he believed his remarks sufficient to require a hearing under subdivision (b) of section 1368. The motion was denied by the judge, citing *People* v. *Dudley* (1978) 81 Cal.App.3d 866 [146 Cal.Rptr. 767]. He found no substantial evidence casting doubt on appellant's competency to stand trial, and stated that, based on his own observations, appellant appeared "very competent." Thereafter, appellant took the stand and testified, presenting a coherent defense to first degree murder, consistently denying the existence of any prior discussion or plan to rob or kill Mos.

Appellant argues that the court's ruling was erroneous because Penal Code section 1368, subdivision (b), as amended in 1974, mandates a hearing on competency whenever counsel voices a belief that the defendant is incompetent. Appellant has misinterpreted the section. Defense counsel's motion pursuant to the statute does not rob the court of its discretion "... merely upon the statement of defense counsel that he believes the defendant is mentally incompetent." (*People* v. *Hays* (1976) 54 Cal.App.3d 755, 759 [126 Cal.Rptr. 770].)

The language of subdivision (b) of section 1368 is not self-initiating; it can only be read as a response to subdivision (a). Otherwise the provision for counsel informing the court that he believes the defendant to be competent, standing by itself, would be an absurdity.

We find no abuse of discretion. The record fails to disclose substantial evidence of incompetence as required. The objective substantial evidence necessary to trigger the requirement of a hearing is evidence that the defendant is incapable because of mental illness of understanding the nature of the proceedings against him, or of assisting in his defense. (*People* v. *Sundberg* (1981) 124 Cal.App.3d 944, 955 [177 Cal.Rptr. 734].) "[A]ppellate court inquiry need go no further than a determination of whether such substantial evidence was adduced." (*People* v. *Laudermilk* (1967) 67 Cal.2d 272, 283, fn. 10 [61 Cal.Rptr. 644, 431 P.2d 228]; *People* v. *Pennington* (1967) 66 Cal.2d 508, 518 [58 Cal.Rptr. 374, 426 P.2d 942].)

IX. *Reasonable Doubt.*

 At the beginning of voir dire, the trial judge read a number of instructions to the prospective jurors, including CALJIC No. 2.90.[5] Later, during voir dire, he gave a further explanation: "... there is a presumption of innocence. Remember I read that. The presumption of innocence is a very, very valuable presumption ....

"While we are on ... reasonable doubt, when I read it off I think, you know, sometimes it is hard to catch and yet it isn't as complicated as it sounds. True, [P]eople have to prove their case beyond a reasonable doubt, to a moral certainty. All that means is that you are in there in deliberations and you have a doubt. Well, you take it out here—it is a mental trick, but you can do it—and see if it is based on reason. You are discussing the evidence and thinking about the evidence. If it is based on reason it is a reasonable doubt; if it is just some weird doubt it is not a reasonable doubt, in fact it is an unreasonable doubt and you should reject it. That's all it amounts to. It is a heavier burden than in civil law but it is not an impossible burden. The [P]eople don't have to prove their case beyond all possible doubt. It is just beyond a reasonable doubt, a doubt based on reason."

After nine days of trial, the judge again read CALJIC No. 2.90 without the "explanation." This and other instructions were sent into the jury room during deliberations. Appellant, who did not object at the time, now contends that the "explanation" constitutes reversible error.

A trial court's attempts to improve or explain standard jury instructions are generally erroneous and universally discouraged by reviewing courts. (*People* v. *Brigham* (1979) 25 Cal.3d 283, 290 [157 Cal.Rptr. 905, 599 P.2d 100]; *People* v. *Garcia* (1975) 54 Cal.App.3d 61, 63 [126 Cal.Rptr. 275].) The judge's remarks herein did not misstate the law and do not require reversal.

---

[5]CALJIC No. 2.90, third edition 1970, as given herein, provides: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt. Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge."

Comparison with the instructions cited in *Brigham* and *Garcia* shows that the trial court's explanation did not tell the jury that reasonable doubt must be founded on "*some good reason*" or "such doubt as you are able to find a *reason for in the evidence*," as did the erroneous instruction in *People* v. *Simpson* (1954) 43 Cal.2d 553, 565-566 [275 P.2d 31]. Nor did he suggest a weighing process akin to the standard for civil trials as did the judge's remarks in *Garcia*. (*People* v. *Garcia, supra*, 54 Cal.App.3d at pp. 68-69.) The instruction did not dilute the strength of belief required to convict (see *People* v. *Brigham, supra*, 25 Cal.3d at pp. 290-291).

Unlike the instruction complained of here, the erroneous instruction in *Garcia* was "the last definitive instruction on the subject given by the court, and therefore must reasonably be deemed to have been uppermost in the minds of the jury during their deliberations." (*People* v. *Garcia, supra*, 54 Cal.App.3d at p. 70.) Under the circumstances of this case, the error in the court's remarks, if any, was harmless. (See *People* v. *Brigham, supra*, 25 Cal.3d at p. 292.)

X. *People v. Davis (1981) 29 Cal.3d 814.*

Appellant's remaining contentions are disposed of by *People* v. *Davis, supra*, 29 Cal.3d 814. Appellant was sentenced to state prison without possibility of parole for an offense committed when he was 17 years of age.

In *Davis*, the California Supreme Court reviewed the provisions and legislative history of the 1977 death penalty law (applicable at the time of this offense) and concluded that the statutes did not authorize imprisonment of minors without possibility of parole, or even charging them with special circumstances. Accordingly, as in *Davis*, the judgment imposing a penalty of life imprisonment without possibility of parole must be reversed.

Finally, appellant requested at oral argument that we strike the jury finding of special circumstances. In view of the conclusion in *Davis, supra*, 29 Cal.3d at page 832, that ". . ., the ambiguity [in the legislation] must be resolved in defendant's favor by finding no authority for charging minors with special circumstances," that request will be granted. Appellant is not eligible for commitment to the California Youth Authority. (Welf. & Inst. Code, § 1731.5; see *People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 724-725 [135 Cal.Rptr. 392, 557 P.2d 976].)

The purported enhancement of the life term by one year for personal use of a knife under Penal Code section 12022, subdivision (b), is also stricken. (*People* v. *Walker* (1976) 18 Cal.3d 232, 243-244 [133 Cal.Rptr. 520, 555 P.2d 306].)

The judgment is reversed only insofar as it relates to penalty; we affirm the judgment in all other respects. We order that the special circumstances be stricken and that appellant's sentence in count II be reduced to life imprisonment.

**FRANSON, Acting P. J., and ANDREEN, J.—** We concur.

We wish to note, however, that while we agree with the holding that appellant's statements to Mr. Huston were not the product of a police "interrogation," we disagree with the finding that Huston was not a police agent or peace officer within the meaning of *Miranda*.

Although Huston apparently had no investigative functions, he had training in security measures and had custody responsibility of appellant. In short, Huston was more than a janitor or a cook at the juvenile facility; he was in essence a "jailor."

Justice Kaus, in holding that a security guard employed by the Los Angeles County General Hospital does not belong to that class of people who must advise a suspect of his constitutional rights prior to asking a question which may elicit an incriminating statement, had the following to say in *People* v. *Wright* (1967) 249 Cal.App.2d 692, 694-695 [57 Cal.Rptr. 781]: "It does not matter that a particular employee's duties may be confined to the protection of persons and property on his employer's premises or that his employer may be the state, a political subdivision thereof or a local entity. What does matter is whether he is employed by an agency of government, federal, state or local, whose primary mission is to enforce the law. This conclusion, it appears to us, is implicit from the purposes of the *Dorado* rule, as explained *In re Lopez*, 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380]." (Fns. omitted.)

That Penal Code section 830.5 was amended in 1980 to give peace officer status to supervisors or other employees having custody of wards does not suggest that before the 1980 amendment persons having juvenile custody duties were not already peace officers in the *Miranda* sense. They are directly engaged in the detention of juveniles, which is a

central function of the probation office—an organization whose primary mission is to enforce the law. The amendment merely reflected the existing realities of the juvenile-supervisor relationship.

A petition for a rehearing was denied March 26, 1982, and appellant's petition for a hearing by the Supreme Court was denied April 28, 1982. Bird, C. J., was of the opinion that the petition should be granted.