Filed 9/23/15  P. v. Westover CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GARY LEE WESTOVER,<br><br>        Defendant and Appellant. | H038764<br>(Santa Clara County<br>Super. Ct. No. CC933945)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on August 27, 2015, be modified in the following particulars:

1.  On page 27, line 9 of the first full paragraph, the following sentence is deleted: "And, the trial court correctly instructed the jury that defendant "deliberately acted with conscious disregard for human life" if he, "knowing the act was dangerous to human life[,] elected to perform the act."

2.  On page 4, line 6 of the first paragraph, the following sentence is added after the sentence ending "run the red light":  "Neither of those officers observed any signs that defendant was under the influence of alcohol."

3.  On page 4, line 6 of the first paragraph, the phrase:  "When the officer asked," is changed to:  "However, when one of the officers asked," so the sentence reads as

follows: "However, when one of the officers asked if he had been drinking, defendant reported that he 'had a tall one.' "

There is no change in the judgment.

The petition for rehearing is denied.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

_____

MIHARA, J.

_____

GROVER, J.

Filed 8/27/15  P. v. Westover CA6 (unmodified version)
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GARY LEE WESTOVER, JR.,<br><br>Defendant and Appellant. | H038764<br>(Santa Clara County<br>Super. Ct. No. CC933945) |

## I.     INTRODUCTION

Defendant Gary Lee Westover, Jr. was convicted of second degree murder (Pen. Code, § 187, subd. (a); count 1), gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a); count 2), driving while under the influence of alcohol and causing injury (Veh. Code, § 23153, subd. (a); count 3), and driving with a blood alcohol level of 0.08 percent or more and causing injury (Veh. Code, § 23153, subd. (b); count 4). As to counts 3 and 4, a jury found true allegations that defendant personally inflicted great bodily injury on two victims (Pen. Code, § 12022.7, subd. (a)) and proximately caused injury to an additional victim (Veh. Code, § 23558). Defendant was sentenced to a term of 15 years to life for count 1, consecutive to a 10-year term for count 3 and the associated enhancements. The terms for the remaining counts and allegations were stayed.

On appeal, defendant contends: (1) the trial court erred by refusing to give a pinpoint instruction to explain that, for purposes of CALCRIM No. 520, "an act is dangerous to human life when there is a high probability it will result in death;" (2) the trial court erred by modifying CALCRIM No. 520 to state that "likely to happen" does not mean a greater than 50 percent chance but means a substantial and significant probability; (3) the trial court erred by excluding expert testimony regarding the statistical probability that an act of drunk driving will result in death; (4) the prosecutor committed misconduct during closing argument by providing the jury with dictionary definitions of the word "conscious;" (5) trial counsel was ineffective for failing to elicit evidence that a preliminary alcohol screening (PAS) device was properly calibrated; and (6) the cumulative effect of the errors was prejudicial. For reasons that we shall explain, we will affirm the judgment.

Appellate counsel has filed a petition for writ of habeas corpus, which this court ordered considered with the appeal. We have disposed of the habeas petition by separate order filed this day. (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

## II.    BACKGROUND

### A.    *Charged Incident*

At about 10:45 p.m. on February 3, 2009, Tommy Lee was driving on Ruby Avenue in San Jose. While stopped at a stop sign at the intersection of Ruby and Norwood Avenue, Lee noticed a pickup truck coming from behind him. The speed limit on Ruby was 35 miles per hour, and the truck appeared to be going "too fast." As Lee proceeded through the Ruby/Norwood intersection, he thought the truck was going to hit him. The truck went around Lee's vehicle without stopping or slowing down at the stop sign. Lee continued driving on Ruby. He heard a bang a few seconds later and saw the truck ahead of him, in the middle of the intersection of Ruby and Quimby Road. Lee saw another car in the intersection, flipped onto its side.

2

Alejandra Rodriguez was also driving down Ruby towards Quimby at that time. She was moving into the left turn lane at the intersection when she noticed a pickup truck on her right. There was a red light for her turn lane and a red light for the through lane. However, the truck did not stop at the red light, and it hit another car that was in the intersection. After the collision, the driver of the truck got out of his truck and went over to the other car.

The vehicle that was struck by the truck was a minivan, which was being driven by Christopher Young. Young's wife, Theodoris Price-Young, was sitting in the front passenger seat. Their eight-year-old son Aaron was in the third row of seats. Their six-year-old son Isaac was in the second row of seats, right behind Price-Young. Both boys were in booster seats with seatbelts on.

Young and his family had attended church that evening, and several members of their church were driving behind them as they proceeded west on Quimby towards Ruby. Young drove the speed limit, which was 40 miles per hour. As he approached the intersection, the light turned yellow. He felt it was safe to proceed through the intersection and did so. The truck then collided with the passenger side of his minivan.

Members of the church helped get Isaac and Aaron out of the minivan. Isaac was unconscious and Aaron was crying. After emergency personnel arrived, Price-Young and Young were extracted from the vehicle. Young was taken to the hospital, where he was treated for a broken arm. Price-Young was also taken to the hospital, where she was treated for liver and spleen lacerations and fractured vertebrae. Aaron had some cuts on his face and ear.

Isaac was not breathing when an officer assessed him. Another officer administered CPR until paramedics took over. At 11:05 p.m., Isaac was pronounced dead. An autopsy revealed that he had a broken neck as well as broken bones in both legs, internal bleeding, and abrasions and bruises.

Defendant approached an officer at the scene, saying, "It is all my fault." Defendant had blood on his face. He told the officer he had been coming home from work. He had seen the light turn red, but he "just wanted to get home," so he "decided to go for it," meaning run the red light. Defendant told another officer that he had been the driver of the pickup truck, that the collision was his fault, and that he had run the red light. When the officer asked if he had been drinking, defendant reported that he "had a tall one." Another officer noticed one or two beer cans near the truck. According to a PAS test administered at 11:14 p.m., defendant had a 0.102 percent blood alcohol level.

Another officer noticed that defendant was exhibiting signs of being under the influence of alcohol: he was unsteady, his speech was slurred, his eyes were watery and blood shot, and there was a strong odor of alcohol on his breath. Defendant was transported to the hospital, where blood samples were drawn. Defendant's blood samples had a 0.112 percent blood alcohol level.

At the hospital, defendant again took responsibility for the collision, calling it "totally my fault." He admitted that he went through a red light and that he had been "going too fast."

### B. Defendant's Prior Offenses

On January 23, 1990, when he was 17 years old, defendant drove into a parked car. A responding officer observed that defendant was exhibiting symptoms of intoxication and arrested defendant.

On July 1, 1991, defendant was arrested and charged with being under the influence of alcohol in a public place. (Pen. Code, § 647, subd. (f).) He was convicted of that offense, and his sentence included a requirement that he attend 30 Alcoholics Anonymous (AA) classes within 60 days.

On November 14, 1997, defendant was arrested after he sideswiped another vehicle, which was occupied and stopped at an intersection. Defendant had driven his car after drinking vodka with a friend. At the time of the collision, his friend was the front

4

passenger, and their two children, ages three and four, were in the back seat. Breathalyzer test results showed that defendant's blood alcohol level was 0.15 percent and 0.14 percent. Following that incident, defendant completed a first offender program, which included 10 weeks of education on the risks of drinking and driving, the effects of alcohol on the body, DUI laws, and fatal DUI collisions.

On October 21, 1999, defendant was involved in another collision and was again arrested for driving under the influence of alcohol. A PAS test showed defendant had a blood alcohol level of 0.10 percent, and a post-arrest Breathalyzer test showed his blood alcohol level was 0.11 percent. Although the other driver was the "primary collision factor," defendant's intoxication was an "associated factor." Following that incident, defendant completed another first offender course.

On December 1, 2001, defendant was cited for speeding at a rate of over 100 miles per hour. (Veh. Code, § 22348, subd. (b).) He was later convicted of that offense.

### C.      *Investigation and Expert Testimony – Prosecution*

Criminalist Mark Burry testified as an expert in the area of alcohol impairment. He explained that alcohol affects cognitive functioning, sensory functioning, and motor functioning. Cognitive functioning, such as decision-making, is the first thing affected by alcohol, which can lead to impulsiveness and reduced inhibitions. Sensory functions that are impacted by alcohol include hearing and visual acuity. Impairment of motor functioning affects balance, dexterity, speech, and touch.

A person with a blood alcohol level of 0.08 percent and above will be too impaired to drive. Some people are even too impaired to drive with a blood alcohol level of 0.04 percent. While some people have developed the ability to mask the symptoms of alcohol impairment (i.e., "tolerance"), the effects of alcohol are still present. A male with a blood alcohol level of 0.11 has likely consumed four to five drinks. If the person had not consumed any alcohol during the hour before the test, the person would likely have consumed five to six drinks and would have had a blood alcohol content of 0.12 or

0.13 percent at 10:48 p.m., if all of the alcohol had been absorbed at that time. People eliminate alcohol from their systems at a rate of about one standard drink per hour.

Brake inspections were performed on defendant's pickup truck following the collision. There were no defects or problems with the brake systems; the brakes were working properly at the time. The area of the collision contained no pre-collision tire marks, indicating that neither vehicle had done any significant braking prior to the impact.

The sensing diagnostic module (SDM) from defendant's car had preserved information about defendant's driving because his airbags had deployed. The SDM showed that five seconds before the collision, defendant had been driving at a speed of 52 miles per hour, without any pressure on the gas pedal. Because there was a "downslope" in the road prior to the intersection, defendant had apparently been coasting. Four seconds before the collision, defendant was driving at a speed of 51 miles per hour and briefly applied his brakes. Three seconds before the collision, defendant was driving at a speed of 49 miles per hour and pressed on the gas pedal. At two seconds before the collision, defendant was again driving at a speed of 52 miles per hour, and he was still applying some pressure on the gas pedal. At one second before the collision, defendant went from applying pressure to the gas pedal to applying the brakes. In the opinion of the prosecution's collision reconstruction expert, defendant's red light violation was the cause of the collision.

### D.    *Defense Evidence*

Defendant's uncle, Allen Westover,[1] lived across the street from defendant's cousin, Virginia Westover. On the evening of February 3, 2009, Allen heard and saw defendant over at Virginia's house, playing darts with Virginia's boyfriend, Damon Scott.

---

[1] Since the Westover family members have the same surname, we will refer to them by their first names for purposes of clarity and not out of disrespect.

6

Defendant did not sound intoxicated, and when defendant drove off, Allen did not see anything to indicate defendant was impaired.

According to Scott, defendant and he went out to buy beer two times during the evening. They each bought a 16-ounce beer both times. Defendant drove both times, "like a normal driver." Defendant left the house after receiving some phone calls, which he said were from his girlfriend. Defendant did not seem intoxicated or impaired. However, Scott had suggested that defendant "chill out" instead of leaving immediately, because he had been drinking.

On the day of the collision, defendant had worked in West Sacramento. After work, he drove some coworkers home. Before dropping off the last coworker, defendant stopped to buy beer and pork rinds. He bought a 24-ounce can of Budweiser and drank it with his coworker at about 5:30 p.m.

Defendant then drove to his cousin's house, where he shot darts with Scott. Defendant and Scott went out to buy more beer. Defendant bought another 24-ounce can of Budweiser. He and Scott returned to the house at about 7:00 p.m. or 7:30 p.m., then played more darts and drank the beers. They later went out to buy more beer. Defendant finished his third beer between 10:00 p.m. and 10:30 p.m., then left his cousin's house.

While driving home, defendant stopped at all of the stop signs except the one at Norwood. At that intersection, he was "messing with" his phone and going "a little too fast," so he drove around Lee's car.

Defendant admitted he was still speeding when he approached the intersection of Ruby and Quimby. Defendant saw the red light at the intersection. Defendant could see the light for the Quimby traffic turn yellow, so he figured that his light would turn green by the time he reached the intersection. He tried to "time the light." He believed it was safe for him to do so, although he never saw the light turn green before entering the intersection.

After the collision, defendant went to help the people in the minivan. He unbuckled Isaac; someone else took Isaac out of the car.

Defendant acknowledged that alcohol impairs your driving when "you're drinking too much." He claimed that a person knows they've been drinking too much based on how he or she feels. When he left his cousin's house, he "felt fine" and believed he was "fine to drive."

At the hospital, defendant was treated for a small laceration. While a doctor attended to him, defendant was crying and very emotional. He said something to the effect of, "I can't believe what I did. I'm so sorry." Defendant told an officer that he felt ashamed. He took responsibility for the collision and expressed concern for the victims. Defendant said that he had consumed two 24-ounce beers. Defendant also said that he did not feel "impaired" but that he did feel "more aggressive" because of the alcohol, which changed his driving style.

Srujal Shah was at the intersection of Quimby and Ruby just before the collision. He made a right turn from Quimby onto Ruby just after the light on Quimby turned yellow. He saw the collision a few seconds later.

### E.    Defense Expert Testimony

Forensic toxicologist Kenneth Mark testified that it takes 45 minutes to an hour for alcohol to fully absorb into the bloodstream when a person drinks on an empty stomach. Food can delay alcohol's absorption. A person eliminates alcohol at a rate of 0.016 percent to 0.018 percent per hour.

If a person had a blood alcohol level of 0.102 percent at 11:14 p.m. and a blood alcohol level of 0.112 percent at 11:48 p.m., the person's blood alcohol level would still have been rising at 10:45 p.m. At 10:45 p.m., the person's blood alcohol level would have been about 0.09 percent. The blood alcohol level of a 180-pound individual could have been as low as 0.086 percent.

A person with a blood alcohol level of 0.08 to 0.09 percent would feel the effects of alcohol but might still think it was safe to drive. The person might not show any impairment to a casual observer.

Dr. Rajeev Kelkar testified as the defense's accident reconstruction expert. Dr. Kelkar determined, by viewing the scene of the collision, that the two vehicles would not have been visible to one another until about two seconds before the impact, because of foliage in the area. Normal reaction time for braking is about 1.5 seconds.

Dr. Kelkar also determined that a person driving on Ruby Avenue could see the color of the light for the traffic on Quimby Road from 400 feet away at night. When defendant pressed on the gas pedal three seconds prior to the collision, it could indicate that he saw the Quimby light turn yellow. If so, the yellow light, which lasts for four seconds and is followed by one second of "all red" lights, likely came on about 5.4 seconds prior to the impact. Thus, Dr. Kelkar felt it was a "close call" whether either of the vehicles entered the intersection during a red light.

### F.     Prosecution Rebuttal Evidence

At the intersection of Ruby Avenue and Quimby Road, the light for through traffic on Quimby stays green unless a sensor is tripped by a car in one of the other lanes, or if a pedestrian button is pushed. If there are cars in the left turn lanes on both sides of Ruby, those lanes will get "independent greens" and the light for the through traffic on Ruby will not turn green.

### G.     Charges, Trials, Verdicts, Sentencing

Defendant was charged with second degree murder (Pen. Code, § 187; see § 189), driving while under the influence of alcohol and causing injury (Veh. Code, § 23153, subd. (a)), and driving with a blood alcohol level of 0.08 percent or more and causing injury (Veh. Code, § 23153, subd. (b)). As to the two Vehicle Code charges, the information alleged that defendant personally inflicted great bodily injury on Young and

9

Price-Young (Pen. Code, § 12022.7, subd. (a)), and that he proximately caused injury to Aaron (Veh. Code, § 23558).

A jury trial began on October 12, 2010. On November 19, 2010, the jury returned its verdicts. The jury convicted defendant of the two Vehicle Code violations and found the enhancement allegations true as to those two counts. The jury could not reach a verdict as to the second degree murder count, so the trial court declared a mistrial as to that count.

On May 9, 2011, the District Attorney filed a first amended information, which added a charge of gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)). On April 17, 2012, a jury trial began as to the second degree murder charge and the gross vehicular manslaughter charge. On May 17, 2012, the jury convicted defendant of both offenses.

At the sentencing hearing held on August 31, 2012, the trial court imposed an indeterminate term of 15 years to life for the second degree murder, consecutive to a 10-year determinate term. The 10-year determinate term was comprised of a three-year term for driving while under the influence of alcohol and causing injury (Veh. Code, § 23153, subd. (a)), three-year terms for the two great bodily injury enhancements associated with that charge (Pen. Code, § 12022.7, subd. (a)), and a one-year term for proximately causing injury to an additional victim (Veh. Code, § 23558). The terms for the remaining counts and allegations were stayed.

### III. DISCUSSION

#### A. *CALCRIM No. 520 Issues*

Defendant contends the trial court erred by refusing to give a pinpoint instruction supplementing CALCRIM No. 520, which would have stated that "an act is dangerous to human life when there is a high probability it will result in death." Defendant also contends the trial court erred by adding language to CALCRIM No. 520's definition of a

10

"natural and probable consequence," which told the jury that "[l]ikely to happen does not mean greater than a fifty percent chance" and that the "probability of death . . . must be substantial and significant."

### 1. The Standard Instruction

CALCRIM No. 520 is entitled, "First or Second Degree Murder With Malice Aforethought." It provides the definition of "malice aforethought" and specifies that a conviction of first or second degree murder requires (a) proof that the defendant committed an act that caused the death of another person and (b) proof of either express or implied malice aforethought. (CALCRIM No. 520.)

CALCRIM No. 520 explains that an act causes the death of another person "if the death is the direct, natural and probable consequence of the act and death would not have happened without the act," and it then explains that a "*natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes."

CALCRIM No. 520 further explains that a defendant acts with implied malice if: (1) he or she "intentionally committed an act," (2) "[t]he natural and probable consequences of the act were dangerous to human life," (3) at the time he or she acted, he or she knew the act was "dangerous to human life," and (4) he or she "deliberately acted with conscious disregard" for human life.

### 2. Proceedings Below

During motions in limine, defendant submitted a proposed special instruction that would have pertained to the second element of implied malice, which is stated in the standard instruction as "[t]he natural and probable consequences of the act were dangerous to human life." (CALCRIM No. 520.) Defendant requested the trial court instruct the jury as follows: "For the purpose of defining the second element of implied malice, an act is dangerous to life when there is a high probability it will result in death. Such an act is required before implied malice may be found."

11

During a hearing on motions in limine, the trial court indicated it was "not inclined" to give the pinpoint instruction proposed by defendant, and the court ultimately did not give the instruction.

During the same hearing, the trial court raised the question of what the phrase "likely to happen" means in the context of CALCRIM No. 520's definition of "natural and probable consequence." The trial court asked, "What does that mean? Is it a preponderance? Does it have to be more than fifty percent[?]"

During the jury instructions conference, the trial court indicated it intended to tell the jury that "likely as it relates to natural and probable consequence does not mean a greater than fifty percent chance . . . . The probability . . . however, must be substantial and significant."

Defendant objected, noting that according to the dictionary, the word "likely" means "having a high probability of occurring or being true," and he argued that this was "the appropriate definition of this term." Defendant asserted that the trial court should either provide that definition or not define "likely" at all.

The prosecutor asked that the trial court give the definition it had proposed. The trial court confirmed it would do so, explaining, "I do think that likely as used in this context could be misinterpreted by the jury to mean more likely than not, and I don't believe that likely in this instruction for implied malice means that . . . ."

### 3.    The Modified Instruction

As given, CALCRIM No. 520 first told the jury there were two elements to the crime of murder: "The defendant is charged in count one with murder in violation of Penal Code section 187. To prove the defendant is guilty of this crime, the People must prove that, one: the defendant committed an act that caused the death of another person. [¶] Two, when the defendant acted he had a state of mind called malice aforethought."

The instruction then defined malice aforethought: "There are two kinds of malice aforethought. Express malice and implied malice. Proof of either is sufficient to

12

establish the state of mind required for murder. [¶] The defendant acted with express malice if he unlawfully intended to kill. The defendant acted with implied malice if: one, he intentionally committed an act[;] two, the natural and probable consequences of the act were dangerous to human life. [¶] Three, at the time he acted he knew his act was dangerous to human life, and four, he deliberately acted with conscious disregard for . . . human life. [¶] Malice aforethought does not require hatred or ill-will toward the victim. It is a mental state that must be formed before the act that causes death is committed. [¶] It does not require deliberation or the passage of any particular period of time."

The instruction next discussed causation: "An act causes death if the death is the direct and probable consequence of the act and death would not have happened without the act. [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether the consequence is natural and probable, consider all of the circumstances established by the evidence. [¶] *Likely to happen does not mean greater than a fifty percent chance. The probability of death, however, must be substantial and significant.*" (Italics added.)

The instruction then provided: "A defendant acted deliberately if he[,] knowing the act was dangerous to human life[,] elected to perform the act. [¶] To determine whether a defendant acted with implied malice does not depend exclusively upon the defendant's state of mind at the time of the collision. [¶] In determining whether the defendant deliberately acted with conscious disregard for human life, you may consider his conduct and state of mind before, during and after the time he drove his vehicle."

### 4. Refusal to Give Defense Pinpoint Instruction

Defendant contends that by refusing to give his pinpoint instruction, which would have told the jury "an act is dangerous to life when there is a high probability it will result in death," the trial court violated his right to have the jury instructed on his theory of the case under the due process clause of the Fourteenth Amendment. Defendant further

13

contends that the trial court's error violated his right to a jury trial under the Sixth Amendment.

A defendant "has a right to an instruction that pinpoints the theory of the defense." (*People v. Mincey* (1992) 2 Cal.4th 408, 437, italics omitted.)  The trial court may, however, "properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation]." (*People v. Moon* (2005) 37 Cal.4th 1, 30 (*Moon*).)  We apply the de novo standard of review when determining whether the trial court erred in refusing to give a requested pinpoint instruction. (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.)

Our Supreme Court has explained that the concept of implied malice can be phrased in two ways.  (*People v. Watson* (1981) 30 Cal.3d 290, 300.)  First, implied malice exists "when a person does ' " 'an act, the natural consequences of which are *dangerous to life*, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " . . .' " (*Ibid.*, italics added.)  Stated differently, malice may be implied when a person "does an act with *a high probability that it will result in death* and does it with a base antisocial motive and with a wanton disregard for human life.  [Citation.]" (*Ibid.*, italics added; see also *People v. Dellinger* (1989) 49 Cal.3d 1212, 1219 [the two definitions of implied malice state "one and the same standard"].)

In *People v. Nieto Benitez* (1992) 4 Cal.4th 91 (*Nieto Benitez*), the California Supreme Court rejected the argument that the standard implied malice instruction was faulty because it did not state "a requirement that [the] defendant commit the act with a *high probability* that death will result.  [Citation.]"[2] (*Id.* at p. 111.)  The *Nieto Benitez*

---

[2] The instruction considered in *Nieto Benitez* was CALJIC No. 8.31, which provides:  "Murder of the second degree is [also] the unlawful killing of a human being (continued)

14

court confirmed that the instruction stated an "equivalent" standard by requiring that the defendant commit "an act whose 'natural consequences' are dangerous to life." (*Ibid.*; see also *People v. Cleaves* (1991) 229 Cal.App.3d 367, 378 (*Cleaves*) [the phrase " 'high probability of death' " and the phrase " 'dangerous to human life' " are "synonymous" and "alternative definitions for the same concept"].)

*Nieto Benitez* considered only whether the "high probability of death" language was required as to the physical (objective) component of implied malice—i.e., the defendant's commission of an act that is dangerous to human life. In *People v. Knoller* (2007) 41 Cal.4th 139 (*Knoller*), the California Supreme Court considered whether the phrase "high probability of death" applies to the mental (subjective) component of implied malice—i.e., the requirement that the defendant know that his or her act is dangerous to human life. In *Knoller,* the court held that a finding of implied malice does *not* require the defendant know that his or her conduct involves "a *high probability* of resulting in death." (*Id.* at p. 143.) *Knoller* explained that " 'high probability of death' is the *objective,* not the *subjective*, component of the [implied malice] test." (*Id.* at p. 157.)

Here, defendant argues that the trial court should have told the jury that the "high probability of death" definition applied to the physical/objective component of implied malice—the determination of whether defendant's act was "dangerous to human life." The case law discussed above establishes that the proposed instruction would not have been incorrect. *Nieto Benitez* holds that an act that is "dangerous to human life" is

---

when: [¶] 1. The killing resulted from an intentional act [or by an intentional failure to act in a situation where a person is under a duty to act]; [¶] 2. *The natural consequences of the act [or the failure to act] are dangerous to human life*, and [¶] 3. The act [or the failure to act] was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an intentional act [or the intentional failure to act] it is not necessary to prove that the defendant intended that the act would result in the death of a human being." (Italics added.)

15

equivalent to an act that has a "high probability" of death. (*Nieto Benitez, supra,* 4 Cal.4th at p. 111.) Although *Nieto Benitez* did not involve a request for a pinpoint instruction but rather the claim that such an instruction should have been given sua sponte, *Nieto Benitez* confirms that the phrase "dangerous to human life," as used in CALCRIM No. 520 to describe the nature of the required act, is "synonymous" with the phrase "high probability of death," which defendant requested the court add (see *Cleaves, supra,* 229 Cal.App.3d at p. 378).

However, defendant's proposed instruction had the potential to confuse the jury. The third element of CALCRIM No. 520's definition of implied malice is the mental/subjective element: that the defendant know his or her "act was dangerous to human life." *Knoller* establishes that the phrase "high probability of death" applies only to the physical/objective component of implied malice, not the mental/subjective component. (*Knoller, supra,* 41 Cal.4th at p. 157.) Although defendant's proposed instruction specified that it was "[f]or the purpose of defining the second element of implied malice" (the physical/objective component), the instruction would have been confusing because the phrase "dangerous to human life" is used in both the second and third elements of CALCRIM No. 520's definition of implied malice. Since defendant's proposed instruction was "potentially confusing," the trial court did not err in failing to give it. (*Moon, supra,* 37 Cal.4th at p. 30.)

### 5. Added Definition of "Likely to Happen"

As noted above, the trial court modified CALCRIM No. 520 by adding the following language to the standard instruction: "Likely to happen does not mean greater than a fifty percent chance. The probability of death, however, must be substantial and significant."

Defendant contends the trial court's modification of CALCRIM No. 520 misstated the law and reduced the prosecution's burden of proof, violating his right to due process under the Fourteenth Amendment and his right to have the jury determine his guilt

16

beyond a reasonable doubt under the Sixth Amendment.  He also contends the instruction misstated an element of the offense in violation of the Sixth Amendment.

As defendant points out, "[a] trial court's attempts to improve or explain standard jury instructions are generally erroneous and universally discouraged by reviewing courts.  [Citations.]"  (*People v. Claxton* (1982) 129 Cal.App.3d 638, 668 (*Claxton*), disapproved on other grounds by *People v. Fuentes* (1998) 61 Cal.App.4th 956, 969, fn. 12.)  But if the trial court's added language "did not misstate the law," reversal is not required.  (*Claxton, supra,* at p. 668.)

" 'An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law.'  [Citation.]  ' " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " '  [Citation.]  Taking into account the instructions as a whole and the trial record, we 'determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'  [Citation.]"  (*People v. Acosta* (2014) 226 Cal.App.4th 108, 119 (*Acosta*).)

Defendant first contends there was a reasonable likelihood that the jury would construe the phrase "substantial and significant [probability of death]" to set a lower standard than the phrase "dangerous to human life."

As noted above, CALCRIM No. 520 uses the phrase "natural and probable consequence" in defining two separate aspects of second degree implied malice murder: (1) causation and (2) the second element of implied malice.

When explaining the requirements for causation, CALCRIM No. 520 provides: "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  A *natural and probable consequence* is one that a reasonable person would know is *likely to happen* if nothing

17

unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."  (Second italics added.)

CALCRIM No. 520 also uses the phrase "natural and probable consequences" in the definition of implied malice, stating that a defendant acted with implied malice if (1) he or she "intentionally committed an act," (2) "[t]he natural and probable consequences of the act were dangerous to human life," (3) at the time he or she acted, the defendant "knew" that his or her "act was dangerous to human life," and (4) he or she "deliberately acted with conscious disregard for human life."

In this case, the trial court's added definition of "likely to happen," which told the jury that the "probability of death . . . must be substantial and significant" and that "[l]ikely to happen does not mean greater than a fifty percent chance," followed immediately after the instruction's definition of causation.  Thus, the modified instruction did not indicate that the definition of "likely to happen" related to any of the elements of implied malice.

Even assuming that a reasonable jury might have understood the trial court's modification to be related to the second element of implied malice ("[t]he natural and probable consequences of the act were dangerous to human life"), we would not find error.  As noted previously, the California Supreme Court has held that by requiring that the defendant commit "an act whose 'natural consequences' are dangerous to life," the implied malice instruction sets forth a standard that is equivalent to  "a requirement that [the] defendant commit the act with a *high probability* that death will result.  [Citation.]" (*Nieto Benitez, supra,* 4 Cal.4th at p. 111.)  The California Supreme Court has also equated the phrases "dangerous to human life," " 'substantial risk that someone will be killed' " and " ' "high probability" that death will result.' "  (*People v. Robertson* (2004) 34 Cal.4th 156, 166 (*Robertson*), overruled on other grounds by *People v. Chun* (2009) 45 Cal.4th 1172, 1201 (*Chun*).)

18

In *Robertson*, the court discussed the phrases "dangerous to human life," "substantial risk that someone will be killed" and "high probability that death will result" in the context of the second degree felony-murder rule, which applies when there is "an unlawful killing in the course of the commission of a felony that is inherently dangerous to human life." (*Robertson, supra,* 34 Cal.4th at p. 164; see *id.* at p. 166.) The *Robertson* court explained that "[a] felony is considered inherently dangerous to human life when the felony, viewed in the abstract, 'by its very nature . . . cannot be committed without creating a substantial risk that someone will be killed' [citation], or carries a ' "high probability" that death will result.' [Citations.]" (*Id.* at pp. 166-167.) The *Robertson* court also quoted with approval the following language from *People v. Clem* (2000) 78 Cal.App.4th 346, 349: " ' "[h]igh probability" ' in this context [i.e., second degree felony murder] does not mean a ' "greater than 50 percent" ' chance." (See *Robertson, supra,* at p. 167.)

Defendant asserts that second degree felony murder cases do not provide authority for determining whether the phrase "substantial and significant" may properly be added to CALCRIM No. 520. However, while "[t]he second degree felony-murder rule eliminates the need for the prosecution to establish the *mental* component" of implied malice, the "*physical* requirement . . . remains the same." (*People v. Patterson* (1989) 49 Cal.3d 615, 626.) Thus, the "physical requirement" of felony murder is identical to the second element of implied malice. Implied malice has " 'both a physical and a mental component,' " the physical component being " 'the performance of "*an act, the natural consequences of which are dangerous to life*." [Citation.]' " (*Chun, supra,* 45 Cal.4th at p. 1181, italics added.) A defendant satisfies the same "physical requirement" in felony murder: If a defendant has committed a felony that is inherently dangerous to life, he or she has committed " ' "*an act, the natural consequences of which are dangerous to life*." ' " (*Id.* at p. 1182, italics added.) Thus, an act that creates a " 'substantial risk that someone will be killed' " (*Robertson, supra,* 34 Cal.4th at p. 166)

19

is an act that is "dangerous to human life" (CALCRIM No. 520) whether the act is looked at under the circumstances (i.e., in an implied malice case) or in the abstract (i.e., in a second degree felony murder case).

Defendant also complains that the trial court's modification of CALCRIM No. 520 improperly "turned the jury's subjective, qualitative analysis of concepts like 'likely' and 'probable' into an exercise in statistical calibration." However, as noted above, the California Supreme Court has expressly affirmed that for purposes of the physical/objective component of implied malice, there need not be a " ' " 'greater than 50 percent' " chance' " that the defendant's act will result in death. (*Robertson, supra,* 34 Cal.4th at p. 167.)

We reiterate that the trial court generally should not "attempt[] to improve or explain standard jury instructions." (*Claxton, supra,* 129 Cal.App.3d at p. 668.) Here, however, the language added by the trial court "did not misstate the law" (*ibid.*), and there is no " 'reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*Acosta, supra,* 226 Cal.App.4th at p. 119.) Thus, the trial court did not err by modifying CALCRIM No. 520 to state that "[l]ikely to happen does not mean greater than a fifty percent chance" and that the "probability of death . . . must be substantial and significant."

### B. Exclusion of Expert Testimony

Defendant contends the trial court erred by excluding expert testimony regarding the statistical probability that an act of drunk driving will result in death.

#### 1. Proceedings Below

Prior to the second trial, defendant informed the prosecution that he intended to call Alan Donelson, Ph.D., as an expert regarding the statistical likelihood that a person who drives while intoxicated will cause a collision resulting in death. Dr. Donelson had submitted a report to defendant's trial counsel in which he opined that "the probability of a driver with an illegal BAC [blood alcohol concentration] causing a fatal crash" is "low,

20

that is, very unlikely." Dr. Donelson provided data concerning the number of fatal crashes involving drivers with a BAC of 0.08 percent or higher and the number of alcohol-impaired driving episodes, then concluded that the likelihood of a fatal crash caused by a person driving while impaired by alcohol was one in every 11,400 impaired-driving episodes.

The prosecution requested the trial court exclude Dr. Donelson's testimony, arguing that it was irrelevant, lacking in foundation, and contradictory to judicial and legislative authority to the extent it suggested that drinking and driving was not dangerous to human life.

During the hearing on motions in limine, defendant argued that the trial court should permit Dr. Donelson to testify. Defendant argued that the statistics regarding fatal drunk driving collisions were relevant to the issue of whether his act involved a "high probability of death" as required for implied malice.

The prosecutor reiterated that it is "well-settled legally" that drinking and driving is dangerous to human life. The prosecutor also argued that the evidence should be excluded pursuant to Evidence Code section 352 because it would confuse the jury, since defendant's dangerous behavior included not only drinking and driving, but speeding and running a red light. The prosecutor further argued that the evidence was not proper expert testimony under Evidence Code section 801 because it was within the jury's "realm to decide" whether defendant's conduct was dangerous to human life.

The trial court excluded the proposed expert testimony. The trial court first found that the testimony would not be "particularly helpful to the jury," because most jurors "would know that statistically many people drive with alcohol in their system, and not that many of them end up in a fatal accident." The trial court also noted that the jury would be considering "all [the] circumstances" when deciding whether defendant acted with implied malice. Additionally, the trial court found that the proposed testimony

21

could "cause confusion of the issues" and thus that it was inadmissible under Evidence Code section 352.

### 2. Analysis

Defendant contends that the exclusion of Dr. Donelson's testimony violated his right to present a complete defense in violation of the Sixth and Fourteenth Amendments. He contends the evidence was relevant and the proper subject of expert testimony.

Evidence Code section 352 "accords the trial court broad discretion to exclude even relevant evidence." (*People v. Clark* (2011) 52 Cal.4th 856, 893.) Pursuant to Evidence Code section 352, the trial court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time or . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Evidence Code section 801, subdivision (a) limits the testimony of an expert witness to opinions that are "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." A trial court has broad discretion in determining the admissibility of expert testimony. (*People v. Bui* (2001) 86 Cal.App.4th 1187, 1196.)

"We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion." (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

Here, the trial court found that the proposed expert testimony would not be "particularly helpful to the jury," because most jurors "would know that statistically many people drive with alcohol in their system, and not that many of them end up in a fatal accident." In other words, the trial court found that the subject matter of the proposed expert testimony was not "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) We find no abuse of discretion in this ruling. The trial court could reasonably determine that

expert testimony regarding the precise statistics about drunk driving fatalities would not assist the jury in determining whether defendant's actions were dangerous to human life.

The trial court also noted that the jury would be considering "all [the] circumstances" when deciding whether defendant acted with implied malice, and that the proposed testimony could "cause confusion of the issues." The trial court thus found that the probative value of the evidence was "substantially outweighed by the probability that its admission" would present a "substantial danger of . . . confusing the issues." (Evid. Code, § 352.) Again, we find no abuse of discretion. In determining whether defendant's acts were dangerous to human life, the jury was not considering solely his act of driving while intoxicated. The jury was considering "all [the] circumstances," including defendant's decision to drive after drinking, his prior drunk driving incidents and education, his act of speeding, his near collision with Lee's vehicle, and his act of trying to "time the light" or his act of running the red light. The trial court could reasonably determine that by allowing expert testimony about the statistical probability of a fatality caused by an act of drunk driving, the jury would be confused about what evidence it could consider in determining whether defendant's acts were dangerous to human life.

In sum, the trial court's decision to exclude Dr. Donelson's testimony was not an abuse of discretion.

### C. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct during closing argument by providing the jury with dictionary definitions of the word "conscious."

#### 1. **Proceedings Below**

During deliberations in the first trial, the jury submitted a request for "the legal definition of the phrase 'conscious disregard', as well as the plain English interpretation of this phrase as relevant to" CALCRIM No. 520. In response, the trial court told the

23

jury that the terms "[c]onscious" and "disregard" "have no special legal definition and are to be applied using their ordinary, everyday meaning."

After the first jury indicated it was deadlocked on the second degree murder count, the trial court asked if it would help for the jury to have the "plain English" definition of the phrase "conscious disregard." The foreperson indicated that this would "be helpful to everyone on the panel." After discussion with the parties, the trial court told the jury that "[t]he ordinary meaning of the words 'conscious' and 'disregard' are as follows: [¶] Conscious (adjective) means: aware, [¶] Disregard (noun) means: lack of attention to something, treating it as of no importance."

During closing argument in the second trial, the prosecutor reminded the jury that it had to find that defendant "deliberately acted with conscious disregard for human life" in order to find that he acted with implied malice. The prosecutor argued that this phrase meant "that he knows what he's doing is dangerous to human life. He doesn't care, and he does it anyway."

The prosecutor told the jury, "Conscious disregard has no special legal meaning. There is no special definition of those words in your instructions, and so what the instructions tell us when you have words that have no special legal meaning, they have their ordinary every-day meaning. [¶] Now the instructions also tell you you're not allowed to use the dictionary, so I have used the one for you. Conscious. Mentally aware of one's inner thoughts and feelings. Also of things external to each other . . . ."

The prosecutor used a PowerPoint presentation during her closing argument. Several of the slides contained the phrase "Aware of the danger and ignored it." Several slides related specifically to the phrase "conscious disregard." One slide stated, "<u>Conscious Disregard</u> has no special legal meaning," and it set forth the dictionary definitions of the terms "conscious" and "disregard." The slide defined the word "conscious" as: "1. Mentally aware of one's inner thoughts and feelings and also of things external to oneself. 2. In possession of one's mental faculties; awake. 3. Able to

think, will, perceive." The slide defined the word "disregard" as: "1. To pay no attention to; ignore. 2. To treat without respect or attention." When the prosecutor showed the jury that slide, the phrase "Aware of the danger and ignored it" was superimposed on top of the definitions.

The prosecutor argued that defendant had been conscious at the time of the incident, in that he was "not passed out[,] . . . not in a fugue state," but "aware of what is going on." Defendant objected, arguing: "Trivializes and mis[s]tates the standard, your Honor, and prosecutorial misconduct and move for a mistrial at this point."

The trial court overruled the objection, stating, "The jury is instructed on law. They are instructed that if there is any conflict between what [the] attorneys say and what I have instructed them, they are to go with what I have instructed."

The prosecutor then mentioned a third dictionary definition of conscious: "able to think well and perceive." Next, the prosecutor told the jury the dictionary definitions of "disregard": "To pay no attention to. To ignore. To treat without respect or attention." Then, the prosecutor summarized the meaning of "conscious disregard": "He's aware of the dangers and he ignores it." "Ignoring the dangers is conscious disregard."

Following the prosecutor's argument, defendant requested the trial court give the jury a curative instruction. The instruction would have told the jury that, as used in CALCRIM No. 520, " 'conscious disregard' has a special legal meaning. 'Conscious' in this context does not mean 'awake.' Rather, 'conscious' means the defendant actually appreciated the risk to human life, i.e. the defendant was subjectively aware of the risk to human life."

The trial court declined to give the instruction, noting that under the instructions given, the jury knew that "awareness of the risk to human life is a requirement."

During deliberations, the jury requested readback of the prosecutor's closing argument—specifically, "where the definition of 'conscious' is presented." The trial court sent the following response: "I received your note. Because attorneys' arguments

25

are not evidence, I am not going to have a portion of counsel's closing argument read back to you as you requested. You may, however, request help from the court in defining words or phrases contained in the jury instructions."

### 2. Analysis

Defendant contends the prosecutor committed misconduct. He notes that the jury was precluded from consulting a dictionary (see CALCRIM No. 201), and he asserts that "[l]ogically, there is no difference between the jurors looking up a term in the dictionary and the prosecutor showing them a slide containing the term's dictionary definition . . . and then reading that definition into the record." Defendant further argues that the dictionary definition of the word "conscious" was erroneous, because in the context of the phrase "conscious disregard for human life," the word "conscious" does not mean "awake" or "able to think."

The general rules applying to claims of prosecutorial misconduct are as follows: "Under the federal Constitution, to be reversible, a prosecutor's improper comments must ' "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.] ' "But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citations.]' [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000 (*Cunningham*).) When the claim of prosecutorial misconduct "is based upon 'comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]' [Citations.]" (*Id.* at p. 1001.)

As defendant acknowledges, we need not determine whether, in general, a prosecutor commits misconduct by using a dictionary during closing argument, because "the key issue is whether the argument misstated the law and created a reasonable likelihood that the jury would apply the wrong standard." Under the above standards, the

prosecutor's references to the dictionary definitions of the term "conscious" constituted misconduct only if it was likely that the jury would misconstrue the meaning of that term. In making that assessment, "we must view the statements in the context of the argument as a whole. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) Under these standards, we find no prosecutorial misconduct. The prosecutor presented the jury with three definitions of "conscious" from a dictionary, which included "awake" and "[a]ble to think," but the prosecutor did not rely on these definitions. Instead, the prosecutor repeatedly told the jury that the term "conscious disregard" meant "[h]e's aware of the dangers and he ignores it." The prosecutor argued, "Ignoring the dangers is conscious disregard." She also argued, "He knows what he's doing is dangerous to human life. He doesn't care, and he does it anyway." The phrase "Aware of the danger and ignored it" was superimposed on top of the dictionary definitions provided in the PowerPoint slides. Thus, the prosecutor did not urge the jury to find that defendant acted in conscious disregard for human life simply because he was awake, but because he was aware of the danger posed by his conduct. In the context of the entire closing argument, there is no "reasonable likelihood" that the jury misconstrued the term "conscious." (See *Cunningham, supra,* 25 Cal.4th at p. 1001.)

Moreover, here, the trial court instructed the jury: "You must follow the law as I explained it to you even if you disagree with it. If you believe the attorneys' comments on the law conflict with my instructions, you must follow my instructions." We presume the jury followed that instruction. (See *People v. Adams* (2014) 60 Cal.4th 541, 578; *People v. Almaraz* (1985) 173 Cal.App.3d 304, 319 [any prosecutorial misconduct in referring to dictionary definition of "moral certainty" was cured by admonition to follow court's instructions].) The trial court also responded to the jury's request for readback of the prosecution's argument on this topic by declining to permit the readback and by offering to help the jury with the definition of any words or phrases. And, the trial court correctly instructed the jury that defendant "deliberately acted with conscious disregard

27

for human life" if he, "knowing the act was dangerous to human life[,] elected to perform the act."

In sum, we conclude that there is no "reasonable likelihood" that the jury misconstrued the term "conscious" based on the prosecutor's argument. (See *Cunningham, supra,* 25 Cal.4th at p. 1001.)

### D.     *Ineffective Assistance of Counsel*

Defendant contends trial counsel was ineffective for failing to elicit evidence that the PAS device used to test his alcohol level after the collision had been properly calibrated.

#### 1.      Proceedings Below

As described above, evidence at trial established that defendant's blood alcohol level was 0.102 percent when measured by a PAS device at the scene of the collision and 0.112 percent when he was later subject to a blood draw at the hospital. Defendant's toxicology expert testified that because it takes time for alcohol to absorb, defendant's blood alcohol level could have been as low as 0.086 percent at the time of the collision. This testimony was elicited to support defendant's claim that he did not feel impaired when he was driving and thus did not act with conscious disregard for human life.

At the first trial, the prosecution had elicited evidence from San Jose Police Officer Steven Jeffrey that the PAS device used to test defendant had been calibrated on the morning of the collision, and the calibration records were admitted into evidence. At the second trial, the prosecution did not elicit such evidence.

When defendant's toxicology expert testified at the second trial,[3] he noted that the hypothetical questions posed to him by defendant's trial counsel required him to "put faith" in the accuracy of the PAS device, the calibration of which was "out of [his]

---

[3] The defense had used a different toxicology expert at the first trial.

28

control." The defense expert also noted that in his opinion, a PAS device only determines whether or not alcohol is present and that the "exact value" of a PAS test is imprecise, such that it "ought not [to] be used as an evidential blood alcohol result."

The prosecution's toxicology expert similarly noted that he "would prefer . . . to have calibration records on the [PAS] device" before concluding that its results were accurate. He noted that he could not exclude the possibility that the PAS device was "off."

### 2. Analysis

Defendant argues that his toxicology expert's testimony was undercut by the lack of any evidence establishing that the PAS device had been properly calculated. Defendant contends that his "rising blood alcohol argument" would have been bolstered if trial counsel had called Officer Jeffrey to provide evidence that the PAS device had been properly calculated.

" 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

29

different." [Citation.]' [Citation.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 966; see *Strickland v. Washington* (1984) 466 U.S. 668, 690, 694.)

The decision on what witnesses to utilize is generally deemed a tactical decision. (*People v. Bolin* (1998) 18 Cal.4th 297, 334.) "[A] reviewing court generally may not second-guess" such matters of "trial tactics and strategy." (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059.)

Having reviewed the record, we do not agree with defendant that reasonable trial counsel would have elicited evidence that the PAS device had been properly calibrated. The prosecution did not argue that the PAS results were inaccurate or that the device had *not* been properly calibrated, or that defendant exhibited symptoms of severe impairment immediately following the collision. Thus, trial counsel could reasonably have determined that the calibration evidence was unnecessary. Moreover, while the defense expert did note that the calibration of the PAS device was "out of [his] control," he also criticized PAS devices generally, saying that they "ought not [to] be used as an evidential blood alcohol result." Based on that testimony, trial counsel could reasonably have decided that the calibration evidence would not have significantly bolstered the defense, and that it would be better to focus on other evidence showing that defendant did not feel impaired at the time of the collision. In fact, during closing argument, trial counsel did rely on defendant's behavior after the collision in arguing that he was not "highly intoxicated." Trial counsel pointed out that defendant immediately went out to help the people in the minivan and unbuckled Isaac, then argued that these actions took "some presence of mind, motor skills and adeptness." In sum, based on our review of the record, it appears trial counsel made a reasonable tactical decision not to call Officer Jeffrey or to otherwise elicit evidence that the PAS device had been properly calibrated.

We conclude defendant has not established that his trial counsel was ineffective for failing to elicit evidence showing that the PAS device used to test his alcohol level after the collision had been properly calibrated.

### E.    Cumulative Prejudice

Defendant contends that the cumulative effect of the alleged errors requires reversal.  (See *People v. Hill* (1998) 17 Cal.4th 800, 844 ["a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error"].)  However, we have found no errors to cumulate.

## IV.    DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
MIHARA, J.

_____
GROVER, J.

*People v. Westover*
**H038764**